## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ARSENAL INTERMEDIATE HOLDINGS, LLC, *et al.*,[1] | Case No. 23-10097 (CTG) |
| Debtors. | (Jointly Administered) |
| ARSENAL HEALTH, LLC, | |
| Plaintiff, | |
| v. | **Adv. Pro. No. 23-_____ (CTG)** |
| IRON REINSURANCE COMPANY, INC., | |
| Defendant. | |

## COMPLAINT OF ARSENAL HEALTH, LLC

Plaintiff Arsenal Health, LLC ("Arsenal Health"), a debtor (collectively, with its affiliated entities, the "Debtors") in the above-captioned chapter 11 cases, brings this complaint against the above-captioned defendant Iron Reinsurance Company, Inc. ("Iron Re") seeking declaratory and injunctive relief, and hereby states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are Arsenal Intermediate Holdings, LLC (2513), Arsenal Insurance Management, LLC (3990), and Arsenal Health, LLC (5247). The Debtors' mailing address for the purposes of these chapter 11 cases is 7027 Halcyon Park Drive, Montgomery, Alabama 36117, c/o 3H Agent Services, Inc.

## PRELIMINARY STATEMENT

1.      Iron Re presently holds commingled funds that are earmarked for the benefit of individuals covered by the health benefit plans administered by Arsenal Health (the "Benefit Plans").   From March 2022 through October 2022, two of Arsenal Health's former officers, Norman Chandler and Justin Law, directly or indirectly directed Benefit Plan contributions to be deposited into (and distributed from) one or more accounts held by Iron Re, including an account at FirstBank with the account number ending in 7006 (the "7006 Account").   The Benefit Plan contributions in the 7006 Account came from either (i) a prior account in the name of Arsenal Health (the Synovus Account, as defined below), or (ii) from Arsenal Health's customers, the Benefit Plan sponsors (the "Plan Sponsors"), and their employees, on behalf of themselves and their dependents (the "Covered Individuals").   While one or more employees of co-Debtor Arsenal Insurance Management, LLC ("Arsenal Insurance") and/or Arsenal Health may have previously had access and/or signatory rights to the 7006 Account, following the termination of Norman Chandler and Justin Law in October 2022, Iron Re revoked Arsenal Health's and Arsenal Insurance's access to the 7006 Account in December 2022.   On information and belief, at the time Arsenal Health's and Arsenal Insurance's access to the 7006 Account was revoked, Arsenal Health and Arsenal Insurance understands that there were approximately $1.2 million in the 7006 Account—nearly all of which consisted of contributions to Benefit Plans from Plan Sponsors and Covered Individuals, along with contributions from a prior account that was held in the name of Arsenal Health (i.e., the Synovus Account).

2.      The funds in the 7006 Account, along with any other funds that Iron Re may have received from Plan Sponsors or Covered Individuals, are assets of the Benefit Plans that are to be held in trust pursuant to ERISA and administered by Arsenal Health as a fiduciary under the applicable Administrative Services Agreement with each Plan Sponsor.   As Benefit Plan assets,

the funds in Iron Re's possession may only be used for Benefit Plan purposes. Despite Arsenal Health's repeated requests, Iron Re refuses to provide Arsenal Health with any information on the 7006 Account, or any other account held by Iron Re, and refuses to turn over the funds in the 7006 Account. Accordingly, Arsenal Health brings this action, pursuant to section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), section 1103(a) and 1132 the Employee Retirement Income Security Program Act, 29 U.S.C. §§ 1001–1461 ("ERISA"), and Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking (i) a declaratory judgment that any funds received by Iron Re from Plan Sponsors the funds in the 7006 Account are assets of the applicable Benefit Plan to be held in trust pursuant to ERISA, and (ii) a mandatory injunction requiring Iron Re to turn over the funds in the 7006 Account to Arsenal Health. Absent the relief requested herein, Arsenal Health, the Plan Sponsors, and the Covered Individuals will suffer irreparable harm.

## THE PARTIES

3.      Arsenal Health is an Alabama limited liability company with its address for purposes of service located at 7027 Halcyon Park Drive, Montgomery, Alabama 36117, c/o 3H Agent Services, Inc.

4.      Iron Re is an Alabama mutual captive insurance corporation with its address located at 5151 Hampstead High Street, Suite 200, Montgomery, Alabama 36116. Upon information and belief, Iron Re's registered agent is the Debtors' former CEO, Norman Chandler, whose address is also 5151 Hampstead High Street, Suite 200, Montgomery, Alabama 36116. On further information and belief, Iron Re's president is Thomas Britt Taylor.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District

30226312.5

of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief sought herein are section 105(a) of the Bankruptcy Code, sections 1103(a) and 1132 of ERISA, and Bankruptcy Rule 7065.

## **BACKGROUND**

### A.  The Chapter 11 Cases

7.      On January 26, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code and elected to proceed under Subchapter V of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On the Petition Date, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed William A. Homony as the standing trustee under Subchapter V of the Bankruptcy Code (the "Subchapter V Trustee"). Additional factual background relating to the Debtors' business, capital structure, and the commencement of the Chapter 11 Cases is set forth in detail in the First Day Declaration.

### B.  The Debtors' Prepetition Insurance Administration Agreements

8.      Prepetition, Debtor Arsenal Insurance Management, LLC's ("Arsenal Insurance") core business was managing captive insurance companies, while Arsenal Health's business was administering self-funded group medical and other health benefit plans on behalf of its clients (such plans, the "Benefit Plans"). The Debtors derived revenue from, among other sources, fees

charged for: (i) administering what the Debtors reasonably believed were intended to be self-funded health benefit plans set up on behalf of Arsenal Health's client plan sponsors (e.g., employers and certain associations), (ii) managing and administering enterprise risk pools, (iii) managing Iron Re, a mutual captive insurance company, which provides stop-loss insurance for the health plans; and (iv) captive management services.  As the administrator of the Benefit Plans, Arsenal Health was subject to various contractual obligations to its clients, as well as certain fiduciary and other regulatory obligations under ERISA and other applicable laws.

9.      In 2018, Arsenal Health began enrolling clients (including employers and certain associations, also known as plan sponsors) (the "<u>Plan Sponsors</u>") and assisting in the administration of Benefit Plans on their behalves. Arsenal Health's clients consisted primarily of small and medium-sized businesses.  The Benefit Plans administered by Arsenal Health generally operated as follows:

a.   Each Benefit Plan was funded through monthly contributions from the Plan Sponsors and their respective Covered Individuals.

b.   Each Benefit Plan was responsible for paying each Covered Individual's claims.

c.   In turn, Plan Sponsors were intended to contract for specific medical stop-loss insurance coverage with Iron Re, in accordance with such policy.

10.     The Debtors' core operations were subject to a series of contracts including, among others: (i) an Administrative Services Agreement (the "<u>Administrative Services Agreement</u>," a form of which is attached hereto as **Exhibit 1**) between each Plan Sponsor and Arsenal Health containing, among other documents, the terms on which Arsenal Health would administer the Plan Sponsor's Benefit Plan; and (ii) a Medical Benefits Stop Loss Policy (the "<u>Stop Loss Policy</u>") issued to the Plan Sponsor by Iron Re which  was supposed to contain the terms of the specific stop-loss coverage intended for the benefit of the Plan Sponsor.

11.     <u>Administrative Services Agreement</u>.  The Administrative Services Agreements and related Benefit Plan documentation were intended to govern the terms on which Arsenal Health would coordinate the administration of the Benefit Plans for their clients, the Plan Sponsors. Pursuant to the Administrative Services Agreements, the parties agreed that Arsenal Health, as the "Plan Administrator" (as set forth in such Administrative Services Agreement), would be  "a fiduciary' of the [Benefit Plan] (as that term is defined by ERISA)," and that Arsenal Health would, among other rights, "have discretionary authority and control over the management of the [Benefit Plan]."  *See* Ex. 1.  Under the Administrative Services Agreement and ERISA, the Benefit Plan contributions that Arsenal Health was supposed to receive from Plan Sponsors are intended to be held for the benefit of the Covered Individuals and Benefit Plans, and, thus, are not property generally available to the Debtors' estates.  Additionally, it was anticipated that claims submitted by Covered Individuals would be processed, adjudicated, and paid consistent with the Administrative Services Agreement and their applicable Benefit Plan.  As part of its administration of the Benefit Plans, Arsenal Health retained Fringe Benefit Coordinators, Inc. (herein, "<u>BeneBay</u>") to process the claims under the Administrative Services Agreements.

12.     <u>Stop Loss Policy</u>.  The Stop Loss Policy is an excess loss policy issued to each Plan Sponsor by Iron Re.

13.     Importantly, the funds in the 7006 Account were commingled funds received from all employer Plan Sponsors and were not segregated between employers, much less with respect to any Stop Loss Policies or between employee and employer funds of any particular Plan Sponsor. Because the funds of the Benefits Plans were simply commingled from all Plan Sponsors as part of the 7006 Account, such funds should constitute assets of the Benefit Plans, and as a result, should be held in trust and/or administered for the exclusive benefit of the Covered Individuals,

pursuant to ERISA, along with terms of any related applicable Benefit Plan, if any, and related documentation. The Debtors have no record that anyone ever meaningfully segregated the amounts in the 7006 Account to avail itself of any exception that might apply to the trust requirements of ERISA.

14.     Generally, Plan Sponsors sent Arsenal Health contribution payments consisting of (i) each Plan Sponsor's contribution and (ii) the respective Covered Individuals' contributions. Such contributions to Benefit Plans, among other amounts, were placed into a bank account (or accounts) held at Synovus Bank in Arsenal Health's name (the "Synovus Accounts"). However, during March and April 2022, the Debtors' former management, including Norman Chandler, established the 7006 Account in Iron Re's name instead of Arsenal Health, and thereby, upon information and belief, the Debtors reasonably believe that all of the funds held in the Synovus Account were converted to the 7006 Account in the name of Iron Re primarily at Norman Chandler's discretion. On information and belief, all Benefit Plan contribution payments received from Plan Sponsors, among other sources, after March 2022 were deposited into the 7006 Account. Additionally, after establishing the 7006 Account, any remaining funds in the Synovus Accounts were also transferred to the 7006 Account. From March 2022 to about December 2022, funds in the 7006 Account were, among other uses, used by Arsenal Health and/or Arsenal Insurance to (a) fund claims against Benefit Plans, (b) pay administration fees incurred by third-party administrators such as Benebay, or (c) pay other Benefit Plan expenses.

15.     In October 2022, two of the Debtors' former officers, Norman Chandler and Justin Law, were terminated for cause. Following the termination of the Chandler and Law management, Arsenal Insurance terminated its management agreement with Iron Re.

16.     In December 2022, Iron Re revoked Arsenal Health's access to the 7006 Account, thereby revoking the Benefit Plans' access to the funds held therein.

17.     On information and belief, the 7006 Account contains assets belonging to certain of the Benefit Plans.  Those Benefit Plans may be in a deficit. Without access to the Benefit Plan assets in the 7006 Account, among other assets, those Benefit Plans may have responsibility for claims for medical care that cannot be covered by the applicable Benefit Plan.

18.     Iron Re may have also received funds from Plan Sponsors, comprising Plan Sponsor contributions and Covered Individual contributions, that are held in accounts other than the 7006 Account.

## CAUSES OF ACTION

### Count One
### (Declaratory Relief)

19.     Arsenal Health hereby incorporates the allegations contained in paragraphs 1 through 17 of this Complaint.

20.     An actual, present, existing, and justiciable controversy exists between Arsenal Health and Iron Re regarding the ownership of funds held in the 7006 Account.

21.     Iron Re's refusal to turn over the funds in the 7006 Account, or funds held in any other account that constitute Benefit Plan contributions, for Arsenal Health to administer on behalf of the Benefit Plans threatens substantial harm to Arsenal Health, its estate, the Plan Sponsors, and the Covered Individuals.

22.     Contributions from Covered Individuals are always ERISA benefit plan assets once they can be reasonably segregated from the Plan Sponsor's general assets.  *See* 29 C.F.R. 2510.3-102(a)(1) ("the assets of the plan include amounts . . . that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for

contribution . . . to the plan, as of the earliest date on which such contributions . . . can reasonably be segregated from the employer's general assets").

23.     Under regulations from the United States Department of Labor (the "<u>DOL</u>"), contributions from parties other than Covered Individuals, such as Plan Sponsors, are determined to be assets of the Benefit Plan based on ordinary notions of property rights under common law principles.  DOL Adv. Op. 92-24A, 1994-31A (Sept. 9, 1994) ("In the Department's view, a plan obtains a beneficial interest in particular property if, under common law principles, the property is held in trust for the benefit of the plan or its participants and beneficiaries or the plan otherwise has an interest in such property on the basis of ordinary notions of property rights"); DOL Adv. Op. 2005-08A (May 11, 2005).

24.     Funds sent to the 7006 Account, which has historically paid premiums and/or benefits from such account, are Benefit Plan assets on the basis that the Benefit Plans have a beneficial interest in the account, because, among other reasons, all such funds were commingled together as a single pool of funds to pay claims and other expenses properly paid under such Benefit Plans.  *See* DOL Adv. Op. 94-31A ("a welfare plan generally will have a beneficial interest in particular assets if the employer . . . sets up a separate account with a bank or with a third party in the name of the plan . . ."). *See also*, DOL Adv. Op. 92-24A (Nov. 11, 1992) ("we note that drawing benefit checks on a TPA account, as opposed to an employer account, may suggest to participants that there is an independent source of funds securing payment of their benefits under the plan.").

25.     ERISA plan assets are subject to the "exclusive benefit rule." Section 1103(c)(1) of ERISA provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their

beneficiaries and defraying reasonable expenses of administering the plan." *See also Cook v. Jones & Jordan Engineering*, 2009 WL 37376 (S.D.W.V. 2009) (citing the trust requirement and exclusive benefit rule under sections 1103(a) and 1103(c)(1) of ERISA, where plan contributions were held in a general operating account and were used for operating expenses).

26.    Under section 1103(a) of ERISA, "all assets of an employee benefit plan", such as the funds held in the 7006 Account comprising Benefit Plan assets, "shall be held in trust by one or more trustees." 29 U.S.C. § 1103(a).

27.    Accordingly, Arsenal Health respectfully requests that this Court enter a judgment, declaring that any funds that Iron Re received from Plan Sponsors, including funds held in the 7006 Account, are Benefit Plan assets to be held in trust pursuant to 29 U.S.C. § 1103(a) and, as Benefit Plan assets, may be used only for Benefit Plan purposes.

**Count Two**
**(Injunctive Relief)**

28.    Arsenal Health hereby incorporates the allegations contained in paragraphs 1 through 26 of this Complaint.

29.    Iron Re has refused to transfer the Benefit Plan assets in the 7006 Account, or any other funds that it holds constituting Benefit Plan assets, to Arsenal Health.

30.    Iron Re's refusal to act prevents Arsenal Health from carrying out its fiduciary obligations owing to the Benefit Plans, and thus, in turn, the Plan Sponsors and Covered Individuals.

31.    Arsenal Health has no adequate remedy at law.

32.    Arsenal Health will suffer immediate and irreparable harm in the absence of a mandatory injunction requiring Iron Re to turn over all Benefit Plan assets held by Iron Re, including funds in the 7006 Account, to Arsenal Health.

33.     The balance of hardships and the public interest favor the entry of a mandatory injunction.

34.     Accordingly, Arsenal Health respectfully requests that the Court enter a mandatory injunction requiring Iron Re to turn over the funds that it holds constituting Benefit Plan assets, including funds held in the 7006 Account, to Arsenal Health for Arsenal Health's administration on behalf of the Benefit Plans.

## PRAYER FOR RELIEF

WHEREFORE, Arsenal Health respectfully requests that the Court award Arsenal Health the following: (i) a declaratory judgment that the funds that Iron Re received from Plan Sponsors, including all funds in the 7006 Account, are assets of the applicable Benefit Plan to be held in trust pursuant to ERISA, (ii) a mandatory injunction requiring Iron Re to turn over the funds that it received from Plan Sponsors, including all funds in the 7006 Account, to Arsenal Health, and (iii) attorneys' fees, pre and post judgment interest, costs, and any other relief the Court deems just and proper.

*[Signature page follows.]*

Dated: April 14, 2023
    Wilmington, Delaware

*/s/ S. Alexander Faris*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Sean M. Beach (No. 4070)
Elizabeth S. Justison (No. 5911)
S. Alexander Faris (No. 6278)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:  (302) 571-1256
Emails:    sbeach@ycst.com
        ejustison@ycst.com
        afaris@ycst.com
        sborovinskaya@ycst.com

*Counsel for the Debtors*
*and Debtors in Possession*

30226312.5

**<u>Exhibit 1</u>**

**Administrative Services Agreement**

## ADMINISTRATIVE SERVICES AGREEMENT

This Administrative Services Agreement and accompanying exhibits and appendices which are attached hereto and incorporated herein (collectively referred to as the "Agreement") is made and entered into this _____ day of _____ , 20___ (the "Effective Date"), by and between _____, a [corporation/LLC] duly organized and existing under the laws of the state of _____ with its principal place of business at _____ (hereinafter referred to as the "Plan Sponsor") and **Arsenal Health,** a Limited Liability Company duly organized and existing under the laws of the state of Alabama with its principal place of business at 5151 Hampstead High St Suite 200 Montgomery, AL 36116 (hereinafter referred to as the "Plan Administrator").

WHEREAS, it is agreed that this Agreement will automatically renew each year unless modified, amended or terminated herein as outlined hereafter;

WHEREAS, the Plan Sponsor is a [corporation/company/limited liability company/etc.] that sponsors a self-funded employee welfare benefit plan (the "Plan") within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended;

WHEREAS, the Plan Sponsor desires to make available a program of health care benefits under the Plan and fund said Plan from the general assets of the employer or from a separate trust, funded through salary reductions and/or other plan or employer assets;

WHEREAS, the Plan Sponsor wishes to contract with an independent third-party to perform certain services with respect to the Plan as enumerated below;

WHEREAS, the Plan Administrator desires to contract with the Plan Sponsor to perform certain services with respect to the Plan as enumerated below;

WHEREAS, the parties intend that the Plan Administrator shall be deemed a "fiduciary" of the Plan within the meaning of ERISA and Plan Administrator shall have discretionary authority and final determinative capability with regard to benefit determinations.

THEREFORE, in consideration of the promises and mutual covenants contained herein, the Plan Sponsor and the Plan Administrator enter into this Agreement for administrative services for the Plan.

## ARTICLE I. DEFINITIONS

For purposes of this Agreement, the following words and phrases have the meanings set forth below, unless the context clearly indicates otherwise and wherever appropriate, the singular includes the plural and the plural includes the singular.

1

1.1    Adjudicate means, with respect to all claims submitted to the Plan, process (electronically or manually) and pay, deny or pend for additional information.

1.2    Claim means a request by a Claimant for payment or reimbursement for Covered Services from the Plan.

1.3    Claimant means any person or entity submitting expenses for payment or reimbursement from the Plan.

1.4    Claims Runout means Claims that are incurred but unreported and/or unpaid as of the effective date of termination of this Agreement.

1.5    COBRA means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

1.6    Contribution Account means an account established by the Plan Administrator for collection of monthly contributions and reimbursement for Covered Services.

1.7    Covered Services means the care, treatments, services, supplies, or amounts described in the Plan Document as eligible for payment or reimbursement from the Plan.

1.8    Employer means Plan Sponsor (unless otherwise stated), and any successor organization, subsidiary, or affiliate of such Employer that assumes the obligations of the Employer, the Plan, and this Agreement.

1.9    ERISA means the Employee Retirement Income Security Act of 1974, as amended.

1.10   Health Care Providers means physicians, dentists, hospitals, or other medical practitioners or medical care facilities that are duly licensed and authorized to receive payment or reimbursement for Covered Services provided under the terms of the Plan.

1.11   Paid Claims means claims for benefits solely funded by the Plan Sponsor and submitted for processing to the Plan Administrator and for which payment has been issued to the Claimant or assignee.

1.12   Plan means the self-funded employee welfare benefit plan, which is the subject of this Agreement and which the Plan Sponsor has established and maintains pursuant to the applicable Plan Document.

1.13   Plan Administrator means the person or organization responsible for the functions and management of the Plan.  The Plan Administrator may employ persons or firms to process claims and perform other Plan-connected services.  If a Plan Administrator is not appointed in the Plan Document, then the Plan Administrator is the Plan Sponsor.

1.14    Plan Document means the instrument or instruments that set forth and govern the duties of the Plan Sponsor and eligibility and benefit provisions of the Plan which provide for the payment or reimbursement of Covered Services, as may be amended from time to time.

1.15    Plan Participant is any employee of Employer eligible for enrollment, and his or her covered dependents, who are properly enrolled in and entitled to benefits from the Plan. Persons eligible for enrollment are those who meet the Plan's eligibility requirements.

1.16    Plan Sponsor means the organization, person, or entity identified as the Plan Sponsor in the introduction to this Agreement. This term also includes the Plan Sponsor's designee, unless otherwise indicated.

1.17    Plan Year means the period of time specified as such in the Plan Document.

1.18    Utilization Management means the review and evaluation of medical necessity and appropriateness of the use of health care services, procedures or facilities utilized by a Covered Person under the terms of the Plan, as well as any other services that a vendor of Utilization Management services defines as falling within the scope of this term, upon and after execution of an agreement between the Plan and such Utilization Management vendor.

### ARTICLE II. PURPOSE OF AGREEMENT AND RELATIONSHIP OF PARTIES

2.1    The purpose of this Agreement is to state the terms and conditions by which the Plan Administrator will provide administrative services to the Plan Sponsor as it relates to administration of the Plan(s).

2.2    The parties acknowledge that:

(a) This is a contract for administrative services only as specifically set forth herein.

(b) The Plan Administrator shall not be obligated to disburse more in payment under this Agreement than the Plan Sponsor shall have made available in the Claims Payment Account.

(c) This Agreement shall not be deemed to be a contract of insurance under any laws or regulations. The Plan Administrator does not insure, guarantee or underwrite liability. The Plan Administrator has no responsibility, and the Plan Sponsor has total responsibility, for payment of claims arising under the Plan and all expenses incidental to the Plan.

(d) The Plan Sponsor acknowledges and agrees that the Plan Administrator will not be deemed to be a legal or tax advisor as a result of the performance of any of its duties under this Agreement, including but not limited to claims processing, COBRA or HIPAA administration, or payment or calculation of any applicable taxes, fees, or other assessments. The Plan Administrator makes no representation concerning federal, state,

or local laws, rules or regulations applicable to the Plan. The Plan Sponsor must seek its own counsel for legal advice and guidance.

(e) Except as specifically set forth herein, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives and successors; provided, however, neither party may assign this Agreement or any or all of its rights or obligations hereunder (except by operation of law) without the prior written consent of the other, which consent may not be unreasonably withheld.

(f) The work to be performed by the Plan Administrator under this Agreement may, at its discretion, be performed directly by it or wholly or in part through a subsidiary or affiliate of the Plan Administrator or under an agreement with an organization, agent, advisor, or other person of its choosing. Unless the Plan Sponsor objects to the entity chosen, the Plan Administrator may delegate certain portions of its work under this Agreement to any other entity. The Plan Sponsor retains final authority to decide whether said organization, agent, advisor, or other person may be retained or utilized.

(g) The Plan Administrator will possess, at all times while this Agreement is in effect, an in-force fidelity bond or other insurance as may be required by state and federal laws for the protection of its clients.

(h) The Plan Administrator agrees to comply with any applicable state or federal statutes or regulations regarding its operations.

### ARTICLE III. RESPONSIBILITIES OF THE PLAN ADMINISTRATOR

The Plan Administrator will provide the following administrative services for the Plan on behalf of the Plan Sponsor:

3.1   Administer the enrollment of eligible individuals and termination of Plan Participants as directed by the Plan Sponsor, subject to the provisions of this Agreement.

3.2   Maintain Plan records based on eligibility information submitted by the Plan Sponsor as to the dates on which a Plan Participant's coverage commences and terminates.

3.3   Maintain Plan records of Plan coverage applicable to each Plan Participant based on information submitted by the Plan Sponsor.

3.4   Maintain and operate the Plan in accordance with applicable law, maintain all recordkeeping, and file all forms relative thereto pursuant to any federal, state, or local law.

3.5   Process with due diligence and according to the terms and conditions of the Plan Document all requests, information, and other responsibilities consistent with this Agreement as outlined herein including COBRA and HIPAA administration.

3.6    The Plan Administrator reserves the right to increase the fees outlined within this Agreement in the event that the Plan Sponsor materially alters the Plan Document during the term of this Agreement. A material alteration is one that amends the Plan Document in such a way that it requires the Plan Administrator to expend additional resources to properly perform its functions under this Agreement.

3.7    Execute the Plan's responsibility, on the Plan's behalf, to return funds to the excess loss carrier if and when reimbursement of funds is received by Plan Administrator and/or the Plan, via subrogation, reimbursement, or other claims recovery; after the excess loss carrier has reimbursed the Plan and in accordance with agreement(s) between the Plan and the approved excess loss carrier, if applicable.

3.8    Load eligibility data within **7** business days of receipt. The Plan Administrator will accept emergency additions and/or terminations from the Plan Sponsor on an as-needed basis.

3.9    Provide the Plan Sponsor with an annual projection of paid claims for the upcoming year no later than 30 days prior to renewal.

3.10    Maintain all patient information and other protected or individually identifiable health or health care information in the strictest confidence in accordance with applicable state and federal laws and any and all regulations issued thereunder, and in accordance with Article VIII and the Business Associate Agreement that is incorporated herein.

3.11    If applicable, capture and provide data for IRS Form 5500 filings to the Plan Sponsor.

3.12    Plan Administrator has a contract in place with a third party administrator for administration and processing of all health-related claims. In addition, Plan Administrator has a contract in place with MGM Administrators for administration of dental and vision claims.  Contracts are available upon request.

## ARTICLE IV. RESPONSIBILITIES OF THE PLAN SPONSOR

The Plan Sponsor will:

4.1    Maintain current and accurate Plan eligibility and coverage records, verify Plan Participant eligibility, and submit this information every 12 months to the Plan Administrator. This information shall be provided in a format reasonably acceptable to the Plan Administrator and include the following for each Plan Participant: name, address, Social Security number, date of birth, type of coverage, sex, relationship to employee, changes in coverage, date coverage begins or ends, and any other information necessary to determine eligibility and coverage levels under the Plan. The Plan Sponsor assumes the responsibility for the erroneous disbursement of benefits by the Plan Administrator in the event of error or neglect on the Plan Sponsor's part of providing eligibility and coverage information to the Plan Administrator, including, but not limited to, failure to give timely notification of ineligibility of a former Plan Participant.  Eligibility information may be communicated via electronic eligibility file, transmitted to the Plan Administrator by the Plan Sponsor.

4.2     The Plan Sponsor has delegated all fiduciary responsibility to Plan Administrator. The Plan Administrator is the fiduciary of the Plan (as that term is defined by ERISA), and shall have discretionary authority and control over the management of the Plan and will resolve all Plan ambiguities and disputes relating to the Plan eligibility of a Plan Participant, Plan coverage, denial of Claims, or any other Plan interpretation questions. The Plan Administrator will administer and adjudicate Claims in accordance with the terms of the Plan Document and will have discretionary authority to interpret the Plan Document. If adjudication of a Claim requires interpretation of ambiguous Plan language, the Plan Administrator will be responsible for resolving the ambiguity or any other dispute. In any event, a decision by the Plan Administrator as to any Claim (whether or not it involves a Plan ambiguity or other dispute) shall be final and binding. All other functions, duties and responsibilities of the Plan Administrator are governed exclusively by this Agreement and the Plan Document.]

4.3     Conduct and control all enrollment meetings, maintenance of enrollment records, and distribution of enrollment materials. Pertinent and new enrollment information will be sent to the Plan Administrator every week or as agreed to by and between the parties.

4.4     Monthly contributions will be sent to the Plan Administrator for deposit into a Contribution Account. Plan Sponsor understands that it is solely responsible for the funding of all claims and expenses.

4.5     Not require the Plan Administrator, under any circumstances, to issue payment for Claims, excess loss premiums, or any other costs arising out of the subject matter of this Agreement, unless the Plan Sponsor has previously deposited sufficient funds to cover such payment.

4.6     Provide the Plan Administrator with written notice of any and all revisions or changes to the Plan Document within 10 working days or as agreed to by the parties.

4.7     Provide and timely distribute all notices and information required to be given to Plan Participants.

4.8     Pay any and all taxes, surcharges, licenses, and fees levied by any local, state, or federal authority in connection with the Plan.

4.9     Comply with all applicable law and any agreements to which the Plan Sponsor is a party or to which the Plan Administrator is a party on behalf of the Plan Sponsor.

4.10    Warrant and represent that the only entities that participate, or will participate, in the Plan are in the Plan Sponsor's controlled group of corporations, as that term is defined within ERISA.

4.11    Maintain excess loss insurance with a carrier approved by the Plan Administrator, which approval shall not be unreasonably withheld, and notify the Plan Administrator of any termination, expiration, lapse, or modification of this insurance, if applicable within 2 days of such event. Plan Sponsor may not hold the Plan Administrator responsible in the event

of any denial, reduction, or other decision made by the applicable excess loss carrier, regardless of whether such carrier was placed or recommended by the Plan Administrator, and regardless of reason for such denial, reduction, or decision.

4.12    Maintain any fidelity bond or other insurance as may be required by state or federal law for the protection of the Plan and Plan Participants, if applicable.

4.13    Not hold the Plan Administrator responsible if the Plan is deemed noncompliant with PPACA or regulations promulgated thereunder as the result of the particular benefits offered within the Plan.

4.14    Not copy, sell, transfer, or otherwise use the language in this Agreement to create other documents or for any purposes except those in furtherance of the purposes of this Agreement.

## ARTICLE V. CLAIMS AUDIT

5.1    At the Plan Sponsor's expense, the Plan Sponsor shall have the right to audit any Claims paid by the [Claims Administrator] on behalf of the Plan Sponsor on the premises of the Plan Administrator, during regular business hours. The Plan Administrator reserves the right to charge a reasonable fee to the Plan Sponsor for expenditure of time by the any employees of the Plan Administrator in completing any audits.

5.2    Any errors identified and/or amounts identified as owed to the Plan Sponsor as the result of the audit shall be subject to review and approval by the Plan Administrator prior to any reimbursements to the Plan Sponsor. Overpayments shall be credited to the Claims Payment Account.

5.3    Any and all Claims records or other information reviewed by the Plan Sponsor or any third-party auditor shall be treated as confidential and shall be used strictly within the parameters of the audit. The Plan Sponsor and any third-party auditor shall agree to jointly and severally indemnify and hold the Plan Administrator harmless from any action, cost, expense or liability, including reasonable attorneys' fees, which may arise out of the disclosure of any confidential information obtained through such audit and shall execute an agreement to this effect prior to conducting such audit. This indemnity shall survive termination of this Agreement.

## ARTICLE VI. PROPRIETARY INFORMATION

6.1    The Plan Administrator agrees to treat all proprietary information concerning the Plan Sponsor's operations and the Plan as confidential.

6.2    The Claims Administrator owns and shall own all rights, title and interest in and to the systems, procedures, methodologies and practices used by it in connection with the Claims processing, Claims payment and utilization monitoring functions of the Plan, together with any applicable provider network, the negotiated fees, terms and discounts with providers,

Claims processing, Claims history and utilization data and information (collectively, the "Claims Administrator Proprietary Information"), all of which is proprietary, confidential, and a trade secret of the Claims Administrator. The Plan Sponsor shall have no right, title or interest in or to the Claims Administrator Proprietary Information. The Plan Sponsor agrees to treat all Claims Administrator Proprietary Information in a confidential manner.

6.3     The Plan owns all rights, title, and interest in and to the underlying Plan data and records of claims of all Plan Participants and Beneficiaries (the "Plan Data"). The Plan Administrator shall have access to and shall maintain all Plan Data while this Agreement is in effect and during any period of Claims Runout. The Plan Administrator shall retain such Plan Data until the Plan Administrator receives a request from the Plan Sponsor for transmittal, or for a period of Minimum of Seven (7) Years after the date of termination, whichever occurs first. The Plan Sponsor, and the Plan itself, shall have access to all Plan Data and a copy of all Plan Data in a form and format that is mutually agreed upon by the Plan Administrator and the Plan Sponsor, and if requested, it shall be delivered to the Plan at no cost, no more than once per year and once within 90 days of termination of this Agreement.

6.4     Neither party shall disclose proprietary information to any other entity without the prior written consent of the party that holds the right, title and interest in the information. Nothing in this Article shall prohibit the disclosure of any information required by law, but in the event of any such disclosure, the disclosing party shall immediately notify the other party in writing, describing the circumstances of and extent of the disclosure. This provision shall survive termination of this Agreement.

### ARTICLE VII. TERMINATION AND MODIFICATION OF AGREEMENT

7.1     At any time during the effective term of this Agreement, either the Plan Sponsor or the Plan Administrator may amend or change the provisions of this Agreement. These amendments or changes must be agreed upon in advance in writing by both the Plan Sponsor and the Plan Administrator. However, in the event of a material alteration to the Plan Document, as provided in Article III, a reasonable fee increase may be effected immediately and without written agreement.

7.2     This Agreement may be terminated by either the Plan Sponsor or the Plan Administrator at any time, either upon giving 90 days advance written notice to the other party unless both parties agree to waive such advance notice, or with no notice, as stated below. At the option of the party initiating the termination, the other party may be permitted a cure period (of a length determined by the party initiating the termination) to cure any default.

7.3     The Plan Administrator may, at its option, terminate this Agreement upon the occurrence of any one or more of the following events on 10 days advance written notice to the Plan Sponsor:

   (a) The Plan Sponsor fails to fund the Contribution Account within 30 days of invoice;

(b) A temporary or permanent receiver is appointed by any court for all or substantially all of the Plan Sponsor's assets, the Plan Sponsor makes a general assignment for the benefit of its creditors, or a voluntary or involuntary petition under any bankruptcy law is filed with respect to the Plan Sponsor and it is not dismissed within 10 days of such filing;

(c) The Plan Sponsor fails to pay administration fees or other fees for the services performed by the Plan Administrator in accordance with this Agreement

(d) The Plan Sponsor engages in any unethical business practice or conducts itself in a manner which in the reasonable judgment of the Plan Administrator is in violation of any federal, state, or other government statute, rule, or regulation;

(e) The Plan Sponsor, through its acts, practices, or operations, exposes the Plan Administrator to any existing or potential investigation or litigation; or

(f) The Plan Sponsor permits its excess loss insurance to lapse, whether by failure to pay premiums or otherwise.

7.4     The Plan Sponsor may, at its option, terminate this Agreement upon the occurrence of any one or more of the following events on 10 days advance written notice to the Plan Administrator:

(a) A temporary or permanent receiver is appointed by any court for all or substantially all of the assets of the Plan Administrator, the Plan Administrator makes a general assignment for the benefit of its creditors, or a voluntary or involuntary petition under any bankruptcy law is filed with respect to the Plan Administrator and it is not dismissed within 10 days of such filing;

(b) The Plan Administrator engages in any unethical business practice or conducts itself in a manner that the Plan Sponsor reasonably determines to be in violation of any federal, state, or other government statute, rule, or regulation;

(c) The Plan Administrator, through its acts, practices or operations, exposes the Plan Sponsor to any existing or potential investigation or litigation; or

## ARTICLE VIII. CLAIMS RUNOUT

8.1     If applicable and as agreed to by and between the parties, the Plan Administrator shall pay the Claims Runout for 24 Months following the date of termination of this Agreement (the "Runout Period"). Following termination of this Agreement, the terms of this Agreement shall continue to apply with respect to the processing and payment of such Claims Runout and any fees due to the Plan Administrator, including the indemnification provision and the Business Associate Agreement.

8.2     If applicable, and as agreed to by and between the parties, upon termination of this Agreement, fees due to the Plan Administrator applicable to the Claims Runout shall

include 24 months of fees. Any additional services requested by the Plan Sponsor and not specifically addressed in this Agreement will be subject to a new agreement. Any other fees incurred by the Plan Administrator on behalf of the Plan Sponsor will be billed directly to the Plan Sponsor for payment or paid out of the claims account.

## ARTICLE IX. HIPAA

9.1     The Plan Sponsor agrees that the Plan will be in compliance with all requirements involving the use or disclosure of protected health information as provided for in 45 C.F.R. Part 164. The duties and responsibilities of the Plan Administrator in connection with the requirements imposed by HIPAA and regulations promulgated thereunder will be set forth in the Business Associate Agreement entered into between the Parties to this Agreement.

9.2     In the event the Plan submits claims or eligibility inquiries or any other HIPAA Covered Transaction as defined in 45 CFR Part 160 and 162 to the Plan Administrator through electronic means, the Plan and the Plan Administrator shall comply with all applicable requirements of HIPAA and the Plan and the Plan Administrator shall require any of their respective agents or subcontractors to comply with all applicable requirements of HIPAA.

## ARTICLE X. MISCELLANEOUS

10.1     This Agreement, together with all addenda, exhibits, and appendices supersedes any and all prior representations, conditions, warranties, understandings, proposals, or other agreements between the Plan Sponsor and the Plan Administrator hereto, oral or written, in relation to the services and systems of the Plan Administrator, which are rendered or are to be rendered in connection with its assistance to the Plan Sponsor in the administration of the Plan. This Agreement, together with all addenda, exhibits, and appendices, constitutes the entire Administrative Services Agreement of whatsoever kind or nature existing between the parties.

10.2     The Plan Administrator reserves the right to engage the services of subcontractors in its performance of any services performed hereunder.

10.3     This Agreement may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

10.4     Neither party may assign any of its rights or obligations under this Agreement without the written consent of the other party.

10.5     All notices required to be given to either party by this Agreement shall, unless otherwise specified in writing, be deemed to have been given three (3) days after deposit in the U.S. Mail, first class postage prepaid, certified mail, return receipt requested.

10.6    No forbearance or neglect on the part of either party to enforce or insist upon any of the provisions of this Agreement shall be construed as a waiver, alteration, or modification of the Agreement.

10.7    Exclusivity. The Plan Sponsor warrants that the Plan Administrator will exclusively handle these matters for the Plan Sponsor during the pendency of this Agreement.

10.8    Governing Law. This Agreement is entered into and governed by and construed in accordance with the laws of the state of Alabama without regard to any applicable conflicting choice of law provisions.

10.9    Severability.  All provisions of this Agreement are severable, and the unenforceability or invalidity of any of the provisions shall not affect the validity or enforceability of the remaining provisions.  The remaining provisions will be construed in such a manner as to carry out the full intention of the parties.  Section titles or references used in this Agreement shall not have substantive meaning or content and are not a part of this Agreement.

10.10   Dispute Resolution. All disputes under this Agreement shall be settled by arbitration pursuant to the rules of the American Arbitration Association.  Arbitration may be commenced at any time by either party giving written notice to the other party that such dispute has been referred to arbitration under this Section.  The arbitrator shall be selected by the joint agreement of the Plan Sponsor and Plan Administrator, but if they do not agree within twenty (20) business days after the date of the notice referred-to above, the selection will be made pursuant to the rules maintained by the Association.  Any award rendered by the arbitrator will be conclusive and binding upon the parties and is to be accompanied by a written opinion of the arbitrator giving the reasons for this award.  This provision for arbitration will be specifically enforceable by the parties.  The decision of the arbitrator will be final and binding and there will be no right of appeal.  Each party will pay its own expenses of arbitration and the expenses of the parties will be equally shared unless, if in the opinion of the arbitrator, any claim or any defense or objection was unreasonable, in which case the arbitrator may assess, as part of his award, all or any part of the arbitration expenses of the other party (including reasonable attorneys' fees) and of the arbitrator against the party raising such unreasonable claim, defense or objection.

10.11   Force Majeure.  Neither party will be liable for any failure or delay in performance of its obligations hereunder by reason of any event or circumstance beyond its reasonable control, including but not limited to acts of God, war, riot, strike, labor disturbance, fire explosion, telephone network failure(s), flood or shortage or failure of suppliers.  If any delay in performance under this section continues for more than 30 consecutive days, the unaffected party will have the right to terminate this agreement with 15 days prior written notice to the affected party, unless the affected party is able to remedy its circumstances within the 15-day notice period.

10.12   Indemnification.  In addition to the terms already set forth, each party agrees to indemnify and hold harmless the other party against all claims, demands, costs, expenses (including reasonable attorneys' fees), liabilities, and losses arising under this

Agreement where such claims, demands, costs, expenses, liabilities, and losses are caused by acts or omissions of the indemnifying party.

(a) The Plan Administrator will indemnify, defend, and hold the Plan Sponsor and its respective directors, officers and employees harmless from and against any and all claims, suits, actions, liabilities, losses, fines, penalties, damages, and expenses of any kind including, but not limited to, court costs and attorney's fees, that the Plan Sponsor may suffer or incur as a result of any dishonest, fraudulent, grossly negligent, or criminal act or omission of the Plan Administrator or its employees, or by a breach of confidentiality or right of privacy of any Plan Participant by the Plan Administrator except for acts taken at the specific direction of the Plan Sponsor. Should the Plan Administrator be called upon to indemnify the Plan Sponsor, it may at its discretion choose to handle any defense efforts necessary to counter claims against the Plan Administrator and/or the Plan Sponsor which would give rise to, and necessitate, said indemnification.  The Plan Administrator shall be entitled to rely, without investigation or inquiry, upon any written communication(s) of the Plan Sponsor or agents of the Plan Sponsor. This indemnity does not extend to any acts or omissions other than those enumerated in this paragraph. This indemnity shall survive termination of this Agreement. The remedy for payments made in error will be to seek recovery from the Plan Participant or the provider of services.

(b) The Plan Sponsor will indemnify, defend, and hold the Plan Administrator and its respective directors, officers and employees harmless from and against any and all claims, suits, actions, liabilities, losses, fines, penalties, damages, and expenses of any kind including, but not limited to, court costs and attorney's fees, that the Plan Administrator may suffer or incur as a result of any dishonest, fraudulent, grossly negligent, or criminal act or omission of the Plan Sponsor or its employees, or by the Plan Sponsor's breach of confidentiality or right of privacy of any Plan Participant except for acts taken at the specific direction of the Plan Administrator. Should the Plan Sponsor be called upon to indemnify the Plan Administrator, it may at its discretion choose to handle any defense efforts necessary to counter claims against the Plan Administrator and/or the Plan Sponsor which would give rise to, and necessitate, said indemnification.  The Plan Sponsor shall be entitled to rely, without investigation or inquiry, upon any written communication(s) of the Plan Administrator or agents of the Plan Administrator. This indemnity does not extend to any acts or omissions other than those enumerated in this paragraph. This indemnity shall survive termination of this Agreement.

(c) The Plan Administrator will not be liable for any damages, assessments, or other contractual or other issues arising between the Plan sponsor and any vendor of the Plan Sponsor, even in the event the Plan Administrator has suggested, introduced, or otherwise endorsed the particular vendor. Contracting with vendors and ensuring that such contracts are adhered to is ultimately the responsibility of the Plan Sponsor.

10.13  Damages. In no event shall the Plan Administrator be liable for special or consequential damages, even if the Plan Administrator was advised of, or has agreed to, the possibility

of such damages. This provision is controlling over any conflicting language in any agreement between Plan Sponsor and the Plan Administrator.

10.14   Survival. The Parties agree that Articles 3, 4, 5, 6 and 10 shall survive termination of this Agreement.

10.15   Integration.  The parties acknowledge that they have read this Agreement in its entirety and understand and agree to be bound by its terms and conditions.  This Agreement constitutes a complete and exclusive statement of the understanding between the parties with respect to its subject matter.   This Agreement supersedes and overrides any and all other prior communications and agreements between the parties, whether written or oral.  Any prior agreements, promises, negotiations or representations related to the subject matter not expressly set forth in this Agreement are of no force and effect.  This Agreement is intended to work in concert with a Business Associate Agreement entered into by the parties to this Agreement.

10.16   Third-Party Beneficiaries. The Plan Administrator and the Plan Sponsor specifically acknowledge and agree that no parties shall be third-party beneficiaries under this Agreement. The parties further agree that nothing under this Agreement shall impose upon the Plan Administrator any obligation to any other party including, but not limited to, beneficiaries under the Plan or covered employees or their assignees.

10.17   Intellectual Property. Plan Sponsor may not reuse, redistribute, or otherwise claim the language contained within this Agreement as its own intellectual property. Plan Sponsor may not use this Agreement for any purpose other than that for which it is specifically designed.

10.18   Authority.  Each party represents and warrants to the other that the signatory identified beneath its name below has the authority to execute this Agreement on its behalf.  The parties, intending to be legally bound, have executed and delivered this Agreement as of the date set forth.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on their behalf by their duly authorized representatives' signatures, effective _____.

**ARSENAL HEALTH, LLC**                          _____

BY: _____          BY: _____

PRINTED NAME:                            PRINTED NAME:
_____          _____

TITLE: _____          TITLE: _____

DATE: _____          DATE: _____


AFFILIATES, AGENTS AND/OR SUBSIDIARIES OF PLAN SPONSOR SUBJECT TO THIS AGREEMENT:

_____

_____